May it please the court, Diana Bailey on behalf of the petitioner Ms. Long. We are here today. Ms. Long became a legal permanent resident in 1964 in the year through her US citizen husband who was in the Navy. In 1970 she was convicted by a jury for the crime under California Penal Code 187, murder. She was sentenced to a year or to five years to life. However, she served three years. She then remained married to her United States citizen husband. They had five US citizen children together. She, under Landgraf, to see whether or not IRA, IRA, ADIPA or IMACT would have an impermissible retroactive effect on the defendant. Clearly indicated that the restrictions in these laws would operate retroactively. And under St. Cyr, Toya, Jimenez, Angelis, I believe it's settled that Congress was not clear. So we would go to the second step. Whether or not these laws had an impermissible retroactive effect on Ms. Long. Under Hernandez D. Anderson, which was decided on August 9th 2007, that was the first time this court recognized a discretionary form of relief for a petitioner that had gone to trial. The type of relief was different. It was suspension of deportation versus a 212C waiver. However, it can be, it's very similar. Well actually, so Hernandez D. Anderson, in that case, the reason the court found some reliance on the availability of Section 212C relief was that the petitioner had taken some independent action in reliance upon it that you could point to. She had applied for naturalization. What is the independent action in reliance that exists in this case? I would argue that the independent reliance is that on the certified administrative record, page 60, is Ms. Long's application for relief, her 212C waiver. She did make several, multiple trips outside of the United States after she was incarcerated in prison. Renamed 1976, 1985, and 1987. On each of those occasions, she came back in through Los Angeles International Airport and at that time was inspected by immigration officials. At any of those times, they could have found her inadmissible to the United States and she could have applied for the 212C waiver on any of those occasions. So I would point to that, those actions. So the law changed after that, are you saying? The law, she left in 1976. We have on record that she left in 1976, 85, 87. She says she left multiple times after that date as well. The law changed in 1990 to make a crime like this an aggravated felony if served five years in prison and then also in 1996 it eliminated this form of relief altogether. So are you arguing that she took any of these trips in reliance on the availability of 212C relief? That's what I would argue. And at any of those times, immigration could have put her into proceedings. However, they didn't and she would have been eligible at that time. 212C waivers were granted often. She had lots of equities. She had never recommitted any other offense up until this day. She had five U.S. citizen children. She's now the widow of a Navy officer. She would have had good equities at that time to apply for the 212C waiver. So I would argue that her case is very similar to Hernandez D. Anderson and that it is unreasonably fair that after the law completely changes, that is when the government chose to put her into proceedings. She's now a 72-year-old woman. Another issue... She's not being penalized for those prior trips, though. I'm not sure I understand the relevance of the prior trips to the reliance point. I would just argue that she could have been put into proceedings on any of those occasions that she did rely on during those times. And there's another issue here, right, which is whether St. Cyr, whether a jury conviction is the same as a guilty plea for St. Cyr purposes. And this Court's already considered that argument. Obviously, there's a significant circuit split on the issue, but aren't we bound by that circuit precedent? And Armendar is Montoya and Kaleva. I would distinguish it by using Hernandez D. Anderson and argue that there is a difference in that she did leave the United States. She could have applied for... If she was put in proceedings, she could have applied for the 212C waiver at that time. I would argue that we can distinguish from St. Cyr and the other 9th Circuit cases that have held that a jury conviction is not eligible for a 212C waiver. The I.J.'s decision was in 2003, and she's 65, so you're saying she's 72 now, and this proceeding's been going on all this time? Correct. Another argument that the government could make is that at the time of the conviction, she wasn't technically eligible for 212C because she only had six and a half years as a legal permanent resident. However, there have been some new cases, for instance, Gallego-Vasquez, which that legal permanent resident, at the time of his conviction, he was only a temporary resident. He also had not acquired, at that time, seven years of lawful permanent residence. It was only later that he acquired the seven years of lawful permanent residence. We can also look to Leon La Paz for the thought that at the time of the conviction, he was not eligible for 212C. We know very little about the underlying criminal activity of the murder conviction. All we have is the sentencing transcript. Correct, Your Honor. Do you want to reserve the rest of your time? Yes, Your Honor. May it please the Court, my name is Elizabeth Curlin, and I represent the United States Attorney General, who is the respondent in this case. Your Honor, the issue in this case is whether the statutory repeal of 212C is necessary. In this case, to the extent that she's relying on her decision to proceed to trial as the event triggering her eligibility for 212C relief, this Court has repeatedly rejected that argument as the decision that would trigger the objective reliance necessary for 212C relief, as opposed to the decision to plead guilty or to apply for naturalization. Right, but I hear her saying something else. I hear her saying that she left the country and returned, visiting her family in the Philippines on several occasions where, in reliance on the fact that every time she came back, nobody served at NTA or brought her into proceedings or told her she was an admissible. To the extent that she's saying that her application into this country would establish her reliance, that reliance is not objectively reasonable, because unlike the petitioner in Hernandez, who applied for naturalization while they were in the United States, they applied for that as the Court discussed that decision as being affirmative reliance, because at the time when she applied for naturalization, the consequences were, if she was denied that relief, that she would be put in removal proceedings. And at the time that she made that application, 212C relief was available to her. In the situation of petitioner, if she were to say that her application into the United States was what triggered the event, the difference is she's outside of the United States applying for entry. So the consequences of that application would be simply, if she was denied that application, she would be simply turned away at the border and not allowed to enter the United States, not necessarily that she would be put into removal proceedings so that she would be eligible to apply for 212C relief. Right. But they allowed her in, and they could have actually served her with an NTA, and they didn't. Well, no. If she applied for entry in those previous situations when she made her application for admissibility into the United States, they could have simply turned her away. Right. But they let her in. They let her in. Doesn't that tell her something? But their action of allowing her in is not what is the focus. The focus is in determining whether her reliance on the possibility of being able to apply for relief is reasonable and objectively reasonable. And so that cannot be, when she applied, it's similar to enter the United States, there are, the consequences could be, like if she had gone to trial, the consequences would be she gets turned away at the border and she isn't allowed in, or she gets let in to the United States and continues living here. But there's no, there's no consequence to that, and there's no reliance on, in her, in the inevitability of being placed in removal proceedings, unlike the alien in Hernandez, where if they applied for 12C relief was available, the consequences of that and what makes it an affirmative and objectively reasonable reliance was the fact that if, since they're already in the United States, the only consequence to being denied naturalization would be being placed in removal proceedings. And in that, at that point, like the alien who pleads guilty to a conviction, they know that removal, being put into removal proceedings is a eventuality, is an expected eventuality, because that is the only other alternative. Whereas if an individual decides to proceed to trial, that's not an eventuality. They're contesting their guilt or their innocence, not that they know that they're going to be placed in removal proceedings based on the conviction. So, again, Petitioner cannot claim that she either relied on her guilty conviction or she relied on the ability to enter the United States. Now, I know, of course, we're bound by the precedent of this Court, but I want to explore this idea that you couldn't have relied on the law at the time. At the time of the criminal trial, you would assume that there's no difference between a guilty plea and a jury conviction for purposes of your immigration status. So your decision not to plead and to go to trial very well, perhaps likely, would be influenced by that fact. Isn't that a really significant part of the calculus at the time you're deciding whether to plead or to go to trial? You think, well, it's not going to, either way, my immigration status is going to be the same. If you knew, oh, if I plead, I'll have a much better chance to remain in the country than if I'm convicted after jury, you're much more likely to plea. Well, I think that's what the Court in St. Cyr and what this Court has affirmed in Saravia and Armendaris is the idea that when you, the time that the reliance is measured is at the time when you make that decision. And if someone decides to reject, the main idea behind the plea of guilty and why it was such a clear indicator, rather than going to trial, why it was such a clear indicator of reliance was the idea that you knew that conviction was inevitable because you decided to have a quid pro quo exchange where you, the government receives the benefit of your admitting to the guilt and a conviction and you receive the benefit of having an acquittal knowing that you, if you have immigration, there are consequences to it. You would be placed in removal proceedings and allowed to apply for 212C relief. And that's what the Court found so powerful was that when you apply, when one is trying to decide whether a statute is impermissibly retroactive, because, again, not all retroactivity is impermissible, what makes it impermissible is when it disrupts settled notions of fair play and settled expectations and reasonable reliance. And those three considerations are not at play when someone decides to simply go to trial and contest whether the sentence is for guilt. One way to simplify it is if you knew then what you know now, might you have done something different? And I think it's fairly possible in this case. Well, when it comes to, you know, as this Court, again, has clarified and affirmed in Saravia, it is not, in looking back at the person's, the choices that the person makes, the only way that when someone decides to proceed to go to trial rather than contest, to contest their guilt rather than accept conviction as inevitable would be to say that when they committed the crime, they relied on the fact that they would be able to go to trial. No, I don't think it's the commission of the crime. It's the decision to go to trial or plea. That's the key decision here. And that, again, is still not, it still has been found to not be a measure of objectively reasonable reliance, whether or not whatever the subjective belief that person had. Counsel, in this case, we have a, I guess a 72-year-old woman. She has five children and a husband in the United States. Is this a case that we ought to send to mediation? There are enough unknowns and uncertainties about how we might rule, and yet it would seem that this might be a good candidate. What do you think? Well, Your Honor, we, I, I have, we had it just to be, just to be honest and transparent that the government has made every attempt to see if this case may be a candidate for prosecutorial discretion. But given the, the fact that Petitioner was convicted of murder, and given that. She has only one little murder. A second, a second to. Unfortunately, Your Honor, that is a serious, the nature of her crime is serious enough that it's, and, and, and the fact that because she committed that crime, that places her in the highest enforcement category with regards to removability. And combined with the fact that we were not able to identify any errors in the agency's decision, we believe that this case is not a candidate. How many years ago was this crime committed? She committed the crime in 1970. Now, at the time that she committed the crime, the, both the sentencing judge in the transcript and the, and the parole authority gave her the sentence that they gave based on whatever, the, the short amount of time they gave her was contingent upon the idea that she would be placed in removal proceedings and be deported back to the Philippines as soon as possible. Now, as it, as you can see from the record, she was able to travel, and for whatever reason, she did not come to the attention of immigration authorities until her last trip in 2003. So at that point, that, and that, the, the, the DHS's, the agency's decision to exercise its prosecutorial discretion to put, place her in removal proceedings 30 years after her crime has only benefited her and allowed her to remain in this country. But it's still, to pick up on Judge Fletcher's point, an unusual situation, someone who's been here 47 years and the crime's 41 years old, for someone who's now 72 years old, I think common sense suggests this is an unusual choice of government resources. Well, I understand, Your Honor, and that is why we have attempted to see if there was any way that this case could be, there could be some sort of prosecutorial discretion. So how have you attempted to do this? Who have you spoken with? We have, I have actually checked with, we've checked with our, the management at OIL and, and the, our deputy assistant attorney general. And that decision was made that this case is not a candidate for that. All right, the only other aspect of this that I'll just put all out on the table because I, I share some of the same concerns that have been expressed. When, when, when she was sentenced, and there's no express commentary about deportation proceedings, but there's a lot of commentary about her mental state and the psychiatric reports and how she, how she really needed help. And there were, and at one point the court says that he doesn't think that a prison sentence would do any particular good for her. And, you know, there was also a psychological disturbance because of the pregnancy. And I'm just wondering, have, all we have is this. What, you know, has the agency actually attempted to get more records and understand exactly what this crime was about? Your Honor, I, basically. It sounds like an emotional and some kind of affair and she got pregnant. And I mean, it sounds like a crime of passion as opposed to, just from reading this law a little bit. Well, I would say, I would say that the extent of the, the, based on the record, the extent of the agency's burden at that point was to prove her, to prove that she was convicted of this crime by jury trial. And again, she was convicted by a jury trial. And the, actually in the sentencing judge's decision and also the parole recommendation, they repeatedly say that, yes, the circumstances are sympathetic, but given the nature of the crime and her mental state, the sentencing judge in particular believed that it was important for society as well as for her, her rehabilitation, possible rehabilitation for her to be sent to the Philippines. And that's, and that, that theme has been repeated in the, in those documents that they've said again and again that that should be contingent upon it. What are the elements of second degree murder that was when she was convicted of? Yes. And the elements were that it's premeditation, but any degree, it's fairly vague, but it says anything that is not first degree. And that was, that was basically the level. There does not seem to be in any of the documents any sort of defense or any mitigating factor with simply second degree murder. There wouldn't have been premeditation. That would be something that would not be part of it. I believe that it would be part of it, Your Honor. I, according to the, the Penal Code 187, it simply says any murder that is not first degree murder. And then they go on to state by, by whatever weapon or whatever type. So, Your Honors, I see that I'm actually out of time. So I would just like to close and say that, again, Petitioner is, has not demonstrated affirmative reliance to, to make a claim for an impermissible retroactivity. Thank you. All right. Thank you. You have a couple minutes left. I believe the definition of California Penal Code 187, that what she was convicted of did not require malice of forethought. I would disagree that the sentencing judge, he may have suggested that deportation may be in her best interest or in society's best interest. However, it wasn't an order that, that he gave. And I'd like to also go back to the objective reliance as well. Often when legal permanent residents are put into removal proceedings after vacationing abroad, it's very common for them to either be put into detention or paroled into the United States. So I would disagree with the government's position that she could have, or would have been denied entry and just turned away at the court. And I think by leaving the United States and coming back in, subjecting her record to scrutiny as well as to search and seizure when you enter the United States, she, that is a heavy reliance. A heavy reliance of not being able to come back to the United States and live with your five U.S. citizen children and Navy officer, U.S. citizen husband. And I think that that is an affirmative reliance that this court can rely on. And that it would be fundamentally unfair for a legal permanent resident who has lived a good life in the United States and after over three decades, she's then put into proceedings by the United States government when it could have been done at a much earlier time. She did subject herself to that scrutiny and it wasn't done. So I would ask that this court rely on Hernandez v. Anderson to allow this availability to the petitioner.
judges: Kavanaugh, Fletcher B. , Wardlaw